UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JAQUON A. HARRISON,

    Plaintiff,

v.                                             Case No: 5:18-cv-95-Oc-30PRL

CITY OF OCALA, FLORIDA and CHRIS
SCAGLIONE,

    Defendants.

_____

## SUMMARY JUDGMENT ORDER

Jaquon Harrison, then 16 years old, was approached by Ocala Police Department Officer Chris Scaglione while walking to the store with a friend just after 3 a.m. Harrison recorded part of the encounter on his cellphone, but officers attempted to take his cellphone after detaining him to question him about a recent, nearby burglary. When he refused to turn over his cellphone and identify himself, Scaglione arrested Harrison for resisting. While arresting Harrison, Scaglione used a "knee spike" distraction technique after Harrison inadvertently wrapped Scaglione's fingers in the links of the handcuffs. Harrison is suing the City of Ocala and Scaglione for false arrest, excessive force, violation of Harrison's First Amendment rights, and Florida tort claims for false arrest and battery.

Scaglione now moves for summary judgment arguing he is entitled to qualified immunity for his actions, which would also insulate the City from liability. Harrison argues that Scaglione lacked reasonable suspicion to stop him in the first place, that the force used by Scaglione was disproportional to the force needed, and that Scaglione's actions were

retaliatory. The Court concludes that Scaglione is entitled to qualified immunity on all claims, and he and the City are entitled to judgment.

## FACTS

The material facts are not in dispute as they were recorded by Scaglione's body cam, a second officer's body cam, and, partly, by Harrison's cellphone. (Doc. 20, Exs. C, D, and E). The Court will briefly summarize those facts below after explaining what led to the encounter between Scaglione and Harrison.

On Saturday, August 6, 2016, at approximately 2:20 a.m., a homeowner called the Ocala Police Department ("OPD") to report a vehicle burglary. The homeowner said three black male juveniles had broken into his vehicle parked in his driveway.

Scaglione, although not assigned to investigate the burglary, was asked to sit on the perimeter about a mile from the house. Officers did not witness anyone in the area and K9 units had no success in tracking down the burglars, so officers suspected that the burglary suspects were hiding in a nearby house. After a while, OPD broke the perimeter, meaning the officers left their positions and resumed their normal tasks.

When Scaglione left his position, he went to get coffee from a convenience store a few blocks away. Upon leaving the store at around 3:15 a.m., Scaglione saw Harrison—a black male juvenile—and his friend, Hayden Hendrix—a white male juvenile—walking toward the store from the direction in which the burglary occurred.

Scaglione thought it was suspicious that Harrison—who matched the rough description of the burglary suspects—appeared on the streets shortly after OPD broke perimeter. This was coupled with the facts that (1) Harrison and Hendrix, both juveniles,

2

were walking to the store after 3 a.m.; and (2) no one else was seen outside by officers since the burglary. The fact that Harrison and Hendrix were walking outside after 3 a.m. aroused suspicion not only because of the recent burglary, but also because the City has a mandatory midnight curfew for persons under age 16.[1]

Scaglione then approached Harrison to question him, at which point the rest of the encounter was video recorded. Scaglione asked Harrison from where he was coming, to provide identification, and his age. As evidenced by the recordings, Hendrix immediately began interfering with Scaglione's questioning of Harrison. Scaglione and other OPD officers separated Harrison and Hendrix, but neither would answer the officers' questions. Instead, both refused to tell the officers their names, provide contact information for their parents, or provide an address of where they had been.

But Harrison did tell Scaglione he was 16 and had come from Hendrix's house in the neighborhood, pointing back at the direction in which the burglary had occurred. He told Scaglione that he and Hendrix were going to the store, and he denied having anything to do with the burglary.

Because Harrison would not provide identification and based on the other facts discussed above, Scaglione told Harrison he was taking him into custody. Scaglione then ordered Harrison to give him his cellphone, which until this point Harrison had been

---

[1] The curfew—§ 42-15, City Code of Ordinances—codifies §§ 877.20–877.24, Florida Statutes. Section 877.22(1)(b), Florida Statutes, states: "A minor may not be or remain in a public place or establishment between the hours of 12:01 a.m. and 6:00 a.m. on Saturdays, Sundays, and legal holidays." The statute then requires law enforcement to transport the minor to a police station or other appropriate facility to attempt to contact the minor's parent. § 877.22(4), Fla. Stat. For purposes of the statute, minors are defined as persons under the age of 16. § 877.21(3), Fla. Stat.

holding with both hands at chest height with its back facing the officers. Scaglione testified at his deposition that he took the phone away from Harrison because he thought Harrison could use it as a weapon or contact accomplices to ambush the officers had he been involved in the burglary. Harrison never told the officers he was recording the encounter on his cellphone, and there was no other indication—such as the cellphone's flash being illuminated—to put Scaglione on notice that the phone was recording.

Harrison refused to give him the cell phone, and Scaglione attempted to take it away. After struggling to take the phone from Harrison, Scaglione told Harrison he was placing him under arrest for resisting.

Scaglione began handcuffing Harrison behind his back, and another officer attempted to take Harrison's phone. Harrison resisted the officer trying to take his phone, and inadvertently wrapped the handcuff chain around Scaglione's fingers. Scaglione, who said it felt like his fingers were breaking, performed a "knee spike" distraction technique on Harrison's outer right thigh. This caused Harrison to fall to the ground, and he cried out in pain. Scaglione freed his fingers from the handcuff chain, and then is seen walking away and shaking his hand in pain.

Harrison was then helped off the ground by another officer and stood unassisted near Scaglione's police cruiser. Harrison was not crying or showing any indication he was in pain. Scaglione then put Harrison in the back of the police cruiser.

During this encounter, which had lasted approximately 6 minutes, Scaglione and other officers radioed at least twice to ask for verification of the burglary suspects' description to confirm that Harrison fit the description. OPD officers then brought the

homeowner to where Scaglione was located to see if Harrison was one of the burglary suspects, and Harrison stood from the cruiser unassisted and without any apparent pain.[2]

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); Fed. R. Civ. P. 56(c). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that

---

[2] Although not relevant for the purposes of the motion, the homeowner indicated at the scene that Harrison was one of the burglary suspects, but later said he did not believe Harrison was one of the suspects. Harrison was never arrested in connection with the burglary.

5

there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248–49.

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## **DISCUSSION**

Scaglione argues he is entitled to qualified immunity for his actions. Qualified immunity protects government officials engaged in discretionary functions unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted). Qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). At the summary judgment stage, courts view the facts from the plaintiff's perspective because the determinative issue is "not which facts the parties might be able to prove, but, rather, whether or not certain given facts" demonstrate

a violation of clearly established law. *Santana v. Miami-Dade Cty.*, No. 15-14338, 2017 WL 2191468, at *4 (11th Cir. May 17, 2017).

"To receive qualified immunity, 'the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' " *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). If a defendant proves he was acting within the scope of his discretionary authority, "the burden then shift[s] to the [plaintiff] to show that qualified immunity should not apply because: (1) the [official] violated a constitutional right, and (2) that right was clearly established at the time of the incident." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

Here, Harrison does not dispute that Scaglione was acting within his discretionary authority when he stopped Harrison, arrested him, and took his cellphone. So the question for the Court is whether Harrison demonstrated that Scaglione's actions violated Harrison's constitutional rights that were clearly established on the date of the arrest.[3] The Court will separately address whether Scaglione had qualified immunity for each claim.

## A. False Arrest Claims

Harrison's false arrest claim is not premised on Scaglione's lack of probable cause to arrest him for resisting. Instead, Harrison argues that Scaglione lacked reasonable suspicion to stop him in the first place. (Doc. 25, pp. 4–9). And, Harrison argues, because

---

[3] If Scaglione is entitled to qualified immunity, then Harrison's claims against the City likewise fail. *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009) ("The Supreme Court has explained, '[N]either *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact ... the officer inflicted no constitutional harm.' ").

7

Scaglione did not have reasonable suspicion to stop him, the investigatory stop and subsequent arrest for resisting were unconstitutional.

Law enforcement "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Illinois v. Wardlow,* 528 U.S. 119 (2000)). "The interest of 'effective crime prevention and detection,' the Court explained, 'underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' " *Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 853 (11th Cir. 2013) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, (1968)).

Although less stringent than the probable cause standard, reasonable suspicion "requires at least a minimal level of objective justification for making the stop." *Jackson*, 206 F.3d at 1165. Courts consider the totality of the circumstances to determine whether reasonable suspicion exists. *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007). As such, " '[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity,' even if such activity is 'seemingly innocuous to the ordinary citizen.'" *Id.* (citing *United States v. Gordon,* 231 F.3d 750, 754 (11th Cir.2000), and *United States v. Smith,* 201 F.3d 1317, 1323 (11th Cir.2000)). "We also recognize that the police may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Id.* at 1290–91.

8

"Whether an officer has reasonable suspicion is an objective question viewed from the standpoint of a reasonable officer at the scene"; the question "is not whether a specific arresting officer … actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed." *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005). "A suspect's conduct might be ambiguous and susceptible of an innocent explanation, but an officer equipped with articulable suspicion is entitled to resolve that ambiguity in favor of an investigatory stop." *United States v. Graham*, 496 Fed. Appx. 961, 962 (11th Cir. 2012).

"When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson,* 206 F.3d at 1166. So an officer is entitled to qualified immunity related to an investigatory stop if the officer reasonably could have believed that reasonable suspicion existed. *Henning v. Harrel*, No. 6:15-CV-1520-ORL-40KRS, 2017 WL 5197505, at *5 (M.D. Fla. Mar. 1, 2017); *see also Clark*, 544 Fed. App'x at 853 ("an officer 'who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity.'").

Here, the Court concludes that Scaglione had at least arguable reasonable suspicion to detain Harrison for an investigatory stop based on the totality of the circumstances.[4]

---

[4] The parties do not argue at which point the investigatory stop began. An individual is seized when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Jackson*, 206 F.3d at 1166 (quoting *Terry*, 392 U.S. at 16). Here, the Court concludes the investigatory stop began when Scaglione separated Harrison and Hendrix, indicating that the two were not free to continue on their way.

This conclusion is based on these facts: (1) Harrison matched the rough description of the burglary suspects given to Scaglione; (2) Harrison and Hendrix were the only people outside in the area of the burglary, and appeared only after the OPD officers broke perimeter; (3) Harrison and Hendrix were walking outside at 3 a.m. from the direction in which the burglary had occurred; (4) Harrison and Hendrix refused to identify themselves to officers or provide the address from where they had come; and (5) Harrison, a juvenile, was in a public area after curfew and would not provide Scaglione with his name or his mother's contact information.[5] Based on these facts, Scaglione could have reasonably believed that reasonable suspicion existed to detain Harrison regarding the reported burglary or for violating the City's curfew.

In reaching this conclusion, the Court notes there is no indication that Harrison actually did anything illegal prior to the investigatory stop. Harrison, being 16, was not subject to the City's curfew and could be in a public place at 3 a.m. And he was under no obligation to tell Scaglione or the officers his identity or from where he had just come. But just because those actions were not unlawful does not mean that they could not form the basis of Scaglione's arguable reasonable suspicion. *Lindsey*, 482 F.3d at 1290; *Graham*, 496 Fed. Appx. at 962.

---

[5] Unlike the numerous cases on which Harrison relies, this is not a case in which Scaglione's sole basis for performing the stop was because Harrison matched the rough description of the burglary suspects. The Court agrees that fact alone would be insufficient to justify Harrison's detention. But the totality of the circumstances—which includes the fact that Harrison matched the rough description of the burglary suspects—gave Scaglione arguable probable cause to detain Harrison.

Although not argued by Harrison in response to the summary judgment motion, the Court also concludes that Scaglione had arguable probable cause to arrest Harrison for resisting after Harrison was detained. *See Davis v. Williams,* 451 F.3d 759, 762–63 (11th Cir. 2006) ("In the context of a claim for false arrest, an officer is entitled to qualified immunity where that officer had 'arguable probable cause'" to effectuate the arrest.); and *Williams v. Sirmons*, 307 Fed. App'x 354, 358 (11th Cir. 2009) ("Arguable probable cause exists where an objectively reasonable officer in the same circumstances and possessing the same knowledge as the officers effectuating the arrest could have believed that probable cause existed."). During the investigatory stop, Scaglione asked Harrison to identify himself and turn over his cellphone. Harrison refused Scaglione's lawful commands (the Court will address why ordering Harrison to turn over the cellphone was lawful in § C, *infra*), which provided arguable probable cause to arrest him for resisting.

## B. Excessive Force and Battery Claims

Harrison alleges that Scaglione used excessive force when he used the "knee spike" distraction technique on Harrison after Harrison was in handcuffs. Excessive force claims under the Fourth Amendment are subject to the "objective reasonableness" standard. *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009). Under this standard, court consider whether an officer's conduct was reasonable under the unique facts confronting the officer from the viewpoint of a reasonable officer, as opposed to with the "20/20 vision of hindsight." *Id.* This Court is also mindful that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

11

In considering whether an officer's conduct was objectively reasonable, courts consider these factors: "(1) the severity of the crime; (2) whether the individual 'poses an immediate threat to the safety of the officers or others'; (3) whether the individual actively resists or tries to evade arrest by flight; (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; (6) the severity of the injury; and (7) whether officers applied force 'in good faith or [rather did so] maliciously and sadistically.'" *Jones v. Fransen*, 857 F.3d 843, 853 (11th Cir. 2017). Ultimately, force is excessive when the amount and degree surpass what is "necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).

Considering the above factors, the Court concludes the force used by Scaglione was not excessive. Of the seven factors, only factors 1 and 3 support Harrison's excessive force claim; the remaining factors support Scaglione's qualified immunity defense. Although inadvertent, Harrison's act of refusing to let go of his cellphone and resisting the other OPD officer's attempt to remove it from his hands caused the handcuff chain to wrap around Scaglione's fingers, causing him intense pain. Scaglione, who could not pull his fingers free from the handcuff chain, used a single knee spike to Harrison's outer thigh. After the knee spike, Scaglione removed his fingers from the handcuff chain, and then he walked away—ending the use of force when it was no longer necessary. Harrison initially cried out in pain from the knee spike, but he did not appear to be in physical pain throughout the rest of the recorded encounter. And Harrison provided no evidence showing that he has any permanent injury, or that he required treatment because of the knee spike. There is also no evidence that Scaglione's knee spike was malicious or sadistic. Because the factors

12

indicate that Scaglione used the least amount of force necessary to prevent further injury to himself, the Court concludes that he is entitled to qualified immunity on Harrison's excessive force and battery claims.

## C. First Amendment Claim

Harrison argues that Scaglione retaliated against him for exercising his First Amendment rights—video recording the encounter with OPD officers—by taking his cellphone and arresting him. "To state a claim for retaliation under the First Amendment, a plaintiff must demonstrate that (1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). A defendant's action adversely affects speech if the "allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005). For a causal connection to exist, "a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Thampi v. Manatee Cty. Bd. of Comm'rs*, 384 Fed. App'x 983, 990 (11th Cir. 2010) (quoting *Shannon v. BellSouth Telecomm., Inc.,* 292 F.3d 712, 716 (11th Cir. 2002)); *see also Sampson v. City of Miami Gardens*, No. 13-24312-CIV, 2015 WL 11202372, at *26 (S.D. Fla. May 27, 2015) ("To establish a causal connection, a plaintiff must demonstrate his or her protected speech was a motivating factor behind the alleged retaliatory conduct.").

Here, the Court concludes Harrison failed to establish a causal connection. Scaglione testified at his deposition that he took the cellphone from Harrison because he had detained him and believed the cellphone could be used as a weapon or to coordinate an ambush. Scaglione also testified, and the video recording reflects, that he did not arrest Harrison until Harrison resisted by refusing to turn over the cellphone. No facts indicate that Scaglione's actions were at all motivated by Harrison's exercise of his First Amendment rights. In fact, there are no facts demonstrating that Scaglione even knew Harrison was exercising his rights by recording the encounter on his cellphone, which alone entitles Scaglione to judgment on this claim. So the Court concludes Scaglione is entitled to judgment on Harrison's First Amendment retaliation claim because Harrison did not demonstrate that Scaglione violated his First Amendment rights.[6]

## **CONCLUSION**

Scaglione and the City are entitled to judgment against Harrison. Although Harrison initially committed no illegal acts, his presence in the area of the recent burglary after 3 a.m., his matching the rough description of the burglary suspects, and his refusal to identify himself or tell OPD officers from where he was coming gave Scaglione arguable reasonable suspicion to detain him. Then Harrison's continued refusal to cooperate and turn over his cellphone after Scaglione's lawful demand provided arguable probable cause

---

[6] The Court also notes its finding of arguable probable cause on Harrison's false arrest claim also requires that the Court conclude Scaglione is entitled to qualified immunity on Harrison's First Amendment retaliation claim. *Redd v. City of Enter.*, 140 F.3d 1378, 1383 (11th Cir. 1998) ("Because we hold that the officers had arguable probable cause to arrest Anderson for disorderly conduct, we must hold that the officers are also entitled to qualified immunity from the plaintiffs' First Amendment claims.").

to arrest him. And because there is no evidence that Scaglione was aware Harrison was recording the encounter, Scaglione cannot be held liable for violating Harrison's First Amendment rights.

Accordingly, it is ORDERED AND ADJUDGED that:

1. Defendants City of Ocala and Chris Scaglione's Motion for Summary Judgment (Doc. 23) is GRANTED.

2. The Clerk is directed to enter final judgment in favor of Defendants City of Ocala and Chris Scaglione, and against Plaintiff Jaquon A. Harrison.

**DONE** and **ORDERED** in Tampa, Florida, this 21st day of May, 2019.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record